Good morning, Your Honors. May it please the Court, my name is Jessica Hempstead and I represent petitioner Willie Sampson. I'd like to reserve two minutes of my time for rebuttal, if I may. Your Honors, this is a very clear-cut case of ineffective assistance of counsel. The Nevada Supreme Court has already found that Mr. Sampson's trial counsel was deficient for failing to call Dr. Rekoma at trial. The Nevada Supreme Court, however, unreasonably concluded that Mr. Sampson's trial was a failure. Now this was a case where the prosecution's case depended almost entirely on the testimony and therefore on the credibility of the single complaining witness. Ms. Hempstead, the Supreme Court has told us that our review is doubly deferential under the AEDPA standard of review when we're dealing with a Strickland claim and here the Nevada Supreme Court remanded to the Nevada State District Court for an evidentiary hearing. That court made a factual finding that there was ineffective assistance of counsel but no prejudice and the Nevada Supreme Court affirmed that ruling. Why should we not apply the doubly deferential standard of review and affirm the denial of habeas relief? Well, for two reasons, Your Honor. For one, the doubly deferential standard of review refers much more to the deficient performance prong. That is the part that we're expected not to question, that this was reasonable trial strategy and I think it's very clear from the record that counsel had no strategy at all. Your theory is that prong one of Strickland is factual and prong two is legal? Is that your argument? I've never heard that argument. No, that's that's not my argument, Your Honor, but I think when it comes to a finding of specifically prejudice, I don't believe that we're the higher standard for the doubly deferential review is actually the finding of deficient performance in this case. Your position is it's single differential, right? We double defer to decisions that were made by the lawyer because we owe deference to the lawyer for his judgments. Sure. And then we owe deference to the State court for its judgment about what the lawyer did. Correct. But once a State court has determined that the first level of deference flies out the window, right? Correct. And in this case, you review a single differential. It's still, I think that's your position, isn't it? Yes. And at any rate... Somebody back there is gnawing. At any rate, to get to the second... Is there a shill in the audio? Maybe it's a co-counsel. It's a plant. But anyway, in any event, but not to dwell too much on the double differential. The single differential is still pretty daunting. We've gotten reversed any number of times. Correct, Your Honor. As Judge Tolman sometimes predicts. I'm not always right. Often right. So this was not a case where the State court brushed aside the claim. Clearly took a very careful look. Clearly considered the ineffectiveness and found counsel was deficient. And then weighed the... Correct, Your Honor. The prejudice. And how can we second guess that? Because it was an unreasonable application of the second prong of Strickland, and thus we are not subject to the limitations on relief under 2254D. And this was under any... From any way you look at this, the Nevada Supreme Court's decision that there was no prejudice was unreasonable. The Nevada Supreme Court had already found in its remand order numerous reasons why the failure to call Dr. Rekoma to testify about the complainant's ODD was prejudicial, including the fact that there was no corroborating evidence of the actual sexual assault or of any crime. And in particular in this case, the jury was already skeptical. The jury acquitted Mr. Sampson of all of the gun enhancements despite the fact that that was in the complainant's testimony. So there was no corroborating evidence of any of the criminal, of any of the accused criminal acts. Nonetheless, the Nevada Supreme Court... That's not quite correct, counsel. The record shows that there was corroborating physical evidence. In other words, you've got to look at the totality of the evidence. I mean, there was the chair with the ropes, the lotion. You've got the admissions by the defendant that he did indeed pick up the victim, that he bought him food. They found food wrappers from McDonald's in the house. And those specific items of corroborating evidence were cited by the Nevada State District Court in its evidentiary hearing, weren't they? They were, Your Honor. And Mr. Sampson has never denied that any part of that happened. He has been open from the beginning that indeed he did pick up this kid. He thought this was... A complete stranger on the street. Yes, Your Honor. And took him home. And by his own admission, this young boy showers, takes off his clothes. Your client gives him other clothes. And so the real question is, was the young boy sexually molested? Yes. And I understand that's the question. And what's critical about Dr. Recoma's testimony is it would have explained to the jury why this child might have made up such a story. ODD... That's not what he testified to at the evidentiary hearing. He said, I've never had a case with this diagnosis where fabrication of a sexual assault had occurred. Correct, Your Honor. But he doesn't need – that's – the jury only needed to hear – this is a jury that's already skeptical, that's already acquitted on the handgun charges. So this is a jury that already has doubt. Now, the fact that Dr. Recoma wouldn't come in and say, yes, I've had a client lie in this exact set of circumstances doesn't necessarily matter. He doesn't... Well, let me ask you, would it have been admissible evidence to ask Dr. Recoma if he'd ever had someone specifically lie about a sex offense who was ODD? That would have. He wouldn't have been able to – what wouldn't have been admissible, and it's one of the points cited by the state for a finding of no prejudice, is Dr. Recoma could not have come in and testified to whether or not he thought this specific client was lying. Under Nevada state law, he would have been precluded from testifying about whether or not he believed the veracity of this particular witness. What he would have come in and said was, I've – in my higher tendency to lie, and in particular, they have a tendency to make up excuses when they're confronted with authority. And in this case, we know that that's what happened. When P.T. came home initially, the first thing he said to his mother was, according to her testimony, a man grabbed me and threw me in his car. Now, all of the evidence and all of P.T.'s later testimony has bared out the fact that that's, in fact, not what happened. So this – the importance of Dr. Recoma's testimony would have given this already skeptical jury an explanation for why this kid who's in hot water for leaving when he shouldn't have. Counsel, the jury heard the testimony that a complete stranger, an older man, picks up a 15-year-old boy on the street. I mean, that in itself is a very damning piece of evidence. It is, but nonetheless, the jury still didn't believe the entirety of P.T.'s testimony. But then he takes him to a house where there's a chair with ropes, which corroborates the victim's testimony that he was tied up during a portion of the assault. But Mr. Sampson also testified – I mean, he didn't deny that he had this chair with ropes, and as he explained, this was something else. This was for his private sexual practices, and the victim saw it. Well, but there was testimony about the white scarf, and the victim said he was blindfolded. And then they find a white scarf that corroborates the victim's testimony. They found a white handkerchief, Your Honor. Okay, so it's a handkerchief instead of a scarf. It's not clear that those are – Both can be used as a blindfold, can they not? Yes, but it's not clear that those are the same from the record. And I see I'm running short on time, so I'd like to reserve the rest for rebuttal. Okay. We'll hear from the warden. May it please the Court, I am Nevada Deputy Attorney General Dan Roche, and I represent the Respondent-Appellees in this matter. The most important argument in our favor has already been addressed, and that's the standard of review under AEDPA. This Court's reviewing the District Court's decision de novo, but the District Court's ruling was based on the application of AEDPA to a State court ruling. And this Court can't grant relief unless it concludes that the State Court's decision was so unreasonable that it's beyond the possibility for fair-minded disagreement. And Mr. Sampson simply can't make that demonstration in this case. And there's several reasons for that. I find it funny that Mr. Sampson wants to rely on pre-evidentiary hearing statements by the Nevada State Courts about what or what oppositional defiant disorder – what the symptoms of that disorder are, and then once the State Courts had an evidentiary hearing and reviewed all this evidence in detail and made a decision, they want to not defer to that decision. And that's the opposite of what we want, and that's the opposite of what Petitioners generally argue, is that we want State courts to have an evidentiary hearing to look in detail at these issues and make a reasoned decision based on the evidence that's presented, and that is exactly what happened in this case. And for that reason alone, this Court should affirm the District Court's decision. Just briefly address a few issues. The victim in this case, I believe, was 12, not 15, and he testified at the trial, his mother testified at the trial, and they both testified that he wasn't in trouble for coming home at 5 o'clock in the afternoon. The argument that he made up this whole story because he was in trouble and had been caught away from his house is not really believable, and a jury wouldn't have accepted it. But it does seem that he lied to his mother about the circumstances of how he was thrown in the car. Yes, I believe that's true. Some initial reports were I was kidnapped. So that does support the notion that he might have feared he would be in trouble, and so he takes this encounter that appears to be, at least in the beginning, neutral, not forced in any way, and he wants to make it seem like it wasn't his idea, he didn't go along voluntarily, he doesn't have a responsibility for it, he was grabbed, he was thrown in the car. So it does, I mean, the idea that the mother thought he wouldn't be in trouble for this, or she testifies now he wouldn't be in trouble for this, doesn't mean he didn't think he'd be in trouble for it. And a kid, the reason we might think he'd be in trouble, he goes off with some man to his house and, you know, whatever happens, happens there, he might well think that the parents would come down hard on him and say, you know. I mean, many parents would. I'm not sure that if my sons were there when they were that age, did something like that, I wouldn't have come down hard on them. I agree, Your Honor, and I'm not trying to argue that the evidence of the testimony of Dr. Racoma would have had zero weight. I think all the courts that have addressed the issue said it would have had a little bit of weight, not very much weight considering all the corroborating evidence, and it certainly wouldn't have had enough weight that it would have made it reasonably likely that the result of trial would have been different. But it's, you know, it's largely a word-against-word case, right? It's not, Your Honor. And that's the characterization that they would like to make. But there's so much corroborating evidence, including the fact that, I mean, every detail was corroborated except whether or not the actual sexual assault occurred. He testified, all the McDonald's wrappers, the loaded gun that was present, the bottle of lotion next to the bed that he testified where he was lotioned up, the fact that he was found wearing the defendant's boxer briefs and a T-shirt. He was wearing an adult male's underwear and came home. And the fact that the handkerchief or scarf that we talked about that was found in the home was tested for semen and tested positive for the defendant's semen. That detail, and you can read that in the trial transcripts on excerpts of record 958 and 979-82. So it's not just a he-said-she-said situation. This kid was at a 50-something-year-old male's home for several hours, and his story was corroborated by many, many details that were found in the home, including the sex chair with the ropes on it, that were tied in a way that somebody had been in them. And those ropes were taken from the chair and admitted as evidence at trial, and the jury saw all these details corroborated. And then Mr. Sands got up. There were no marks on the boy. No, it wasn't tied so tightly. No rope marks or, how shall I put it delicately, signs of sexual penetration. No, the sexual assault count was based on fellatio and not on any kind of penetration. Is it your position that Dr. Ricoma's testimony was not favorable to the defendant? I don't think it's particularly favorable. I mean, I guess you could argue that it's 50-50 testimony that could have gone either way. He basically testified that at no time did he ever think that this 12-year-old boy lied to him. He had never caught him in a lie. That's not admissible at trial, is it? It is admissible. It's not admissible as you can't call a witness to come testify to that, but if you're going to call a psychiatrist to come in and say, to offer testimony for deliberate purpose of calling into question the victim's honesty, then I'm certain the state on cross-examination could have said, well, did you ever catch him in a lie? Have you ever known anyone with this disorder to lie to you about sexual assault? That certainly would have been acceptable questions on cross-examination. That would have been presented to the jury, and Dr. Ricoma's testimony would have had very little weight with them in light of all the other evidence. But didn't he testify that children with ODD have a tendency to lie, and that's why we have to be careful what they say? He did not testify to that in isolation. He testified in context that because oppositional defiant disorder is a behavioral disorder, children with ODD tend to get in trouble, and when they're caught by authority figures, they tend to make excuses for their behavior. So if you catch your child stealing something from the fridge, did you just take that? And he says, no, I didn't. These are things that all children do, and so it wouldn't necessarily have undermined his credibility that much. But Dr. Ricoma testified that it's a qualified level of untruthfulness with oppositional defiant disorder that occurs in certain situations with certain authority figures. In general, they don't have a tendency to lie. In general, they're not dishonest, and at no point did he testify that oppositional defiant disorder is characterized by lying. He was cross-examined with evidence from the Mayo Clinic that didn't list untruthfulness or dishonesty as a symptom of ODD, and admitted that the literature didn't say that, but it was based on his clinical experience. And so it naturally followed with the questioning, well, if your argument that children with ODD have a tendency to lie, what's that based on? Well, it's based on my clinical experience. Well, in your clinical experience, has someone with ODD ever fabricated an instance of sexual assault? No, they haven't. That natural line of questioning would certainly have occurred at trial and would have been admissible, and the jury would have seen through any attempt to portray the victim as a dishonest or lying child simply because he had been diagnosed with oppositional defiant disorder. I hope that answers your question. And, I mean, the other thing about trial is Samson testified in his own defense, and he got up and sat on the stand and offered testimony that was belied by numerous other witnesses. Two different police officers testified at trial that when they confronted him, they said, do you know that boy that's four houses down on the street? And he said, no, I've never seen him before. That was clearly a lie, and the jury was made aware that he had lied to the law enforcement. And then he got up and offered his testimony, and you can read that in the excerpts of record at trial. It wasn't credible testimony. He offered other statements that were contradicted by at least three other witnesses. And so if you want to argue that this child has a tendency to lie because he's been diagnosed with oppositional defiant disorder, you have to contrast that with the fact that the jury knew for a matter of fact that Mr. Samson lied on the stand, and his testimony was not credible, and the victim's testimony was corroborated by all the physical evidence. It's true that there wasn't any direct physical evidence that the sexual assault occurred, but there was so much cumulative circumstantial evidence of the details of the home, the items that were found there that corroborated the child's story, that it's not reasonably likely that the result of the trial would have been different had Dr. Recoma testified. And that's not even the question that this Court has to address. This Court has to address the fact that whether or not the Nevada Supreme Court's decision that Mr. Samson wasn't prejudiced by the failure to call Dr. Recoma was so wrong that it's beyond the possibility for a fair-minded jurist to disagree about that resolution, and he simply hasn't made that showing. And for that reason, we'd ask you to affirm the district court. Thank you. Thank you. I would note, just to start, the State makes much of the fact that this child was credible and that all this evidence corroborated his testimony. But again, we have a jury that already didn't believe certain portions of his testimony. And the standard under Strickland is only that, but for counsel's error, there was a reasonable probability that the outcome would have been different, which is a probability sufficient to undermine confidence in the outcome. In this case, are you — Is your argument that they didn't believe a portion of the victim's testimony because they acquitted on the gun counts? Correct. Why couldn't we simply ascribe that to a compromise verdict by the jury for other reasons besides the victim? I mean, we — the police did find the gun in the holster, did they not? They did — well, they did find a gun, Your Honor. But even if we have a jury — And that matched what the description that the victim had given of the weapon carried by the assailant. Well, the victim's description of the weapon carried by the defendant was he pulled out an orange cap gun from his pocket when he was speaking with Dr. Castagnet at the hospital and said, it looks like this gun, but bigger and black. So that's not a specific description of the weapon. But didn't he also describe that it came out of a holster at some point and a holster was in fact found by the officers at the — I don't believe he ever described it coming out of a holster. The officers did find a holster. But they did find a holster. Correct. If I just may briefly answer that question. I know that I'm out of time. Even if the jury was simply undertaking a compromise verdict, what we have is a jury that was not convinced of all of the charges beyond a reasonable doubt. And with this evidence that would explain why this complaining witness would have a tendency to make up a story when confronted with authority, I think that's more than sufficient to tip an already skeptical jury into no proof beyond a reasonable doubt. And so there's no way under Strickland that we can have confidence in the outcome of these proceedings, given the failure to call Dr. Ricoma. And for that reason, we would ask that Samson be granted relief. I just have one last question. Oh, sure. Okay. Can you address what he mentioned just briefly, the semen in the briefs? There was semen found on a handkerchief in the defendant's living room. And there's no explanation. That semen was tested. And the criminalist who tested it said they couldn't determine whether it was recent. They couldn't determine when it was from. It was found — there was no semen found on the bed. There was only semen found in this rumpled handkerchief in the living room. Which is where the chair with the ropes was, right? No. The chair with the ropes was in the second back bedroom. So there was no evidence that this was the same semen. And then I'm sorry. I forgot the other — oh, the boxer briefs. Actually, if you look at — hey, it's the EOR record site 1083, when Mr. Samson is being asked about giving these shorts to PT. He says, I gave him shorts for a boxer. So he doesn't actually refer to them as boxer briefs. And if you look at the photographs that were attached to the State record, what he gave him is a pair of silver athletic shorts. So these aren't men's underwear. These are — Mr. Samson said shorts for a boxer, and the prosecutor immediately said, oh, boxer shorts. And it's been in the record as boxer shorts ever since, but it is, in fact, not men's underwear. Thank you. Okay. Thank you. Case, this argument stands submitted.
judges: Rayes, Kozinski, Tallman